**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

SHANJULIA SANCHEZ,                    )
                                      )
            Plaintiff,                )
      v.                              )        C.A. No. N23C-02-077 KMV
                                      )
AMANDA E. HENDRIX, and                )
KATHRYN A. HENDRIX,                   )
                                      )
            Defendants.               )

Submitted: October 10, 2024
Decided: December 13, 2024

## ORDER DENYING SUMMARY JUDGMENT

Having considered defendant Kathryn A. Hendrix's motion for summary judgment and the record in this matter, it appears that:

## BACKGROUND

1.     On October 15, 2022, U.S. postal carrier Shanjulia Sanchez had a very bad day.[1]  Around 4:30 p.m., more than halfway through her shift for the U.S. Postal Service, Shanjulia was lugging mail to a section of row homes in Wilmington, Delaware.[2]  Meanwhile, the family who lived at 730 South Broom Street (the

---

[1] *See* Docket Item ("D.I.") 1. The facts in this decision reflect the record developed through the pleadings. This background provides only the predicate necessary to this Court's ultimate holdings; interested readers are directed to the docket in this matter for additional predicate. First names are used to avoid confusion; this Court intends no disrespect or familiarity. The lodged depositions are cited as Last Name Dep. *See* D.I. 23, Ex. A–C.

[2] Sanchez Dep. 31:6–10.

"Property") just finished a grocery run and was returning home for a pit stop.[3] Defendant Amanda Hendrix stayed in the car parked on the street to smoke a cigarette as her husband, James Miller, and their two daughters went inside to grab some drinks, use the bathroom, and fetch the keys for a concession stand they were helping out with later that evening.[4]

2.    Shanjulia arrived at the Property right after James and the girls went inside; she then scanned a package and put it in the mailbox just outside the front door.[5]  Just then, Shanjulia heard a deafening "WOOF!"[6]  Shanjulia recoiled at the loud barking and, noticing the storm door was ajar, yanked it shut and hurried to the next house.[7]  Then she heard a young lady's voice call out: "[N]o, get back here!"[8]  But it was too late.  Through her peripherals, Shanjulia spotted a black figure bursting through the storm door.[9]  She screamed for help as a black pitbull named Midnight pounced on her, tearing at her flesh.[10]

---

[3] Hendrix, A. Dep. 14:17–15:10, 15:20–23.

[4] *Id.* at 6:11–13, 15:15–18.

[5] Sanchez Dep. 39:6–12.

[6] *Id.* at 39:13–14.

[7] *Id.* at 39:13–16.

[8] *Id.* at 39:17–18.

[9] *Id.* at 39:19–20.

[10] Sanchez Dep. 39:20–40:1.

3. Hearing the shrieks of pain and cries for help, Amanda stopped smoking and jumped out of the car to stop the attack.[11] Midnight released Shanjulia's arm by the time Amanda got to him, but the damage was done.[12] He had bitten Shanjulia's right shoulder, forearm, and leg.[13] Amanda promptly instructed her daughters to drag Midnight back inside as she searched for water, paper towels, and hydrogen peroxide.[14]

4. Shocked and angered by the whole ordeal, Shanjulia dismissed Amanda's apologies and refused offers of aid.[15] Instead, Amanda called her supervisor, Tracy, to inform her about the attack.[16] Tracy instructed her to return to work if possible, so Shanjulia hobbled back to her delivery van and drove to the post office.[17] She debriefed another supervisor, Jessica, who then drove her to Saint Francis Hospital.[18]

---

[11] Hendrix, A. Dep. 16:2–10.

[12] *Id.* at 16:8–12; Sanchez Dep. 40:2–6.

[13] Sanchez Dep. 44:3–11.

[14] Hendrix, A. Dep. 18:5–19, 19:1–5; Sanchez Dep. 40:7–11.

[15] Hendrix, A. Dep. 18:22–23; Sanchez Dep. 40:12–19.

[16] Hendrix, A. Dep. 19:6–9; Sanchez Dep. 40:12–20.

[17] Hendrix, A. Dep. 19:9–12; Sanchez Dep. 48:3–12.

[18] Sanchez Dep. 49:24–50:11.

5.    The medical providers cleaned and sutured Shanjulia's wounds, took pictures and x-rays, then prescribed her pain medication.[19]  After she was released from the hospital, Shanjulia went back to the post office to get her workers' compensation paperwork, and then her son picked her up from work and drove her home.[20]  Following the post office's instructions, Shanjulia did not return to work until mid-November.[21]  Since the attack, she often wakes up from nightmares in cold sweats and becomes anxious whenever she sees a black dog.[22]

6.    On February 9, 2023, Plaintiff brought this action against Amanda and her mother, Kathryn Hendrix, who owns the Property, seeking damages related to the incident.[23]  After some discovery practice, on April 30, 2024, Kathryn moved for summary judgment (the "Motion").[24]  Briefing on the Motion was completed on July 26, 2024, and an oral argument was scheduled for October 10, 2024.[25]  Thereafter, the Court took this matter under advisement.  This is the Court's decision.

---

[19] *Id.* at 50:18–51:9.

[20] *Id.* at 51:12–16.

[21] *Id.* at 54:8–11.

[22] *Id.* at 75:3–21.

[23] D.I. 1.

[24] D.I. 23.

[25] D.I. 24, 35, 39.

## ANALYSIS

7. "Summary judgment is only appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law."[26] "There is no right to a summary judgment."[27] "[W]hen the facts permit a reasonable person to draw but one inference, the question becomes one for decision as a matter of law."[28] At this stage, this Court views the facts in the light most favorable to the non-moving party.[29] The burden rests with the moving party.[30] Here, that is Kathryn.

8. The primary issue pending before this Court is whether Kathryn had actual knowledge of Midnight's vicious nature. Delaware's dog-bite statute, 16 *Del. C.* § 3053F, provides that the owner of a dog is strictly liable for damages caused by

[26] *Riad v. Brandywine Valley SPCA, Inc.*, 319 A.3d 878, 883 (Del. 2024) (citing Super. Ct. Civ. R. 56(c)); *Eco-Mail, Inc. v. Firstsource Health Plans & Health Servs., LLC*, 2024 WL 3738705, at *1 (Del. Super. Aug. 8, 2024) (first citing Super. Ct. Civ. R. 56(c); and then citing *Ebersole v. Lowengrub*, 180 A.2d 467, 469–70 (Del. 1962)).

[27] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002) (first citing *Anglin v. Bergold*, 565 A.2d 279 (Del. 1989); and then citing *Brunswick Corp. v. Bowl-Mor Co., Inc.*, 297 A.2d 67, 69 (Del. 1972)) (internal quotation omitted).

[28] *Feaster v. Tyler*, 2024 WL 4039721, at *2 (Del. Super. Sept. 3, 2024) (citing *Wooten v. Kiger*, 226 A.2d 238, 239 (Del. 1967)).

[29] *Northan v. Thomas*, 2024 WL 2974271, at *2 (Del. Super. June 12, 2024) (citing *DiOssi v. Maroney*, 548 A.2d 1361, 1362 (Del. 1988)); *Feldman v. Marks*, 2024 WL 4263931, at *3 (Del. Super. Sept. 23, 2024) (citing *Legion P'rs Asset Mgmt., LLC v. Underwriters at Lloyds London*, 2021 WL 6621168, at *6 (Del. Super. Sept. 30, 2021)).

[30] *Feldman v. Marks*, 2024 WL 4263931, at *3 (Del. Super. Sept. 23, 2024) (citing *Radulski v. Liberty Mut. Fire Ins. Co.*, 2020 WL 8676027, at *3 (Del. Super. Oct. 28, 2020)).

such dog.[31]  This strict liability "relieves a plaintiff from 'proving specific acts of negligence' and 'protects him from certain defenses' like that embodied in Delaware's comparative negligence statute."[32]  An "owner" is "any person who owns, keeps, harbors, or is the custodian of a dog."[33]

9.  Conversely, a landlord only owes a duty to protect an invitee from a tenant's dog in the landlord's capacity as "(1) harborer of the dog or (2) as a landlord of the dog's owner and *only if Defendant had knowledge of the dog's vicious propensities*."[34]  Put differently, "[t]he imposition of liability on a landlord occurs when the landlord 'knows of the animal's dangerous propensities and the landlord has the power, through its control over the premises, to remove or confine the animal.'"[35]

---

[31] 16 *Del. C.* § 3053F ("The owner of a dog is liable in damages for any injury, death, or loss to person or property that is caused by such dog, unless the injury, death, or loss was caused to the body or property of a person who, at the time, was committing or attempting to commit a trespass or other criminal offense on the property of the owner, or was committing or attempting to commit a criminal offense against any person, or was teasing, tormenting, or abusing the dog.").

[32] *Russo v. Zeigler*, 67 A.3d 536, 540 (Del. Super. 2013) (citations omitted).

[33] 16 *Del. C.* § 3041F(7); *Riad v. Brandywine Valley SPCA, Inc.*, 319 A3d 878, 887–88 (Del. 2024).

[34] *Dougherty v. Hibbits*, 2015 WL 5168157, at *3 (Del. Super. 2015) (quoting *Smith v. Isaacs*, 1999 WL 587350, at *1 (Del. Super. Sept. 21, 1999)) (emphasis in original).

[35] *Id.* at *3 (quoting *Kirshner v. Wilm. Hous. Auth.*, 1997 WL 587350, at *1 (Del. Sept. 11, 1997)).

10.    Here, Kathryn claims Shanjulia "cannot identify any factual dispute or evidence to suggest negligence on the part of Kathryn." Shanjulia contends that Kathryn is liable through her capacity as landlord of the Property.[36] Citing *Wilmington Country Club v. Cowee*, Shanjulia asserts that Kathryn, as landlord, "had a duty to provide Shanjulia with safe ingress and egress to the property."[37] Although *Cowee* deals with a motor vehicle accident on a country club's private roadway, it is analogous; and this Court recognizes the standard for property owners owing a duty to warn invitees of open and obvious dangers.[38]

11.    Here, it is undisputed that James—not Kathryn—is the owner of Midnight.[39] Thus, strict liability does not apply to Kathryn. But, because she is the landlord of the Property, the remaining issue is whether Kathryn knew of Midnight's vicious propensities. Shanjulia thinks so. In support, she asserts that Kathryn's deposition testimony shows that she knew about Midnight's vicious nature.[40] Kathryn disagrees contending that she testified generally about whether a dog could be protective and vicious if it thought someone was harming its owners.[41] Kathryn

---

[36] D.I. 24 ¶ 1–2.

[37] *Id.* ¶ 1 (citing *Wilm. Country Club v. Cowee*, 747 A.2d 1087, 1092 (Del. 2000)).

[38] *Cowee*, 747 A.2d at 1089–90.

[39] Hendrix, A. Dep. at 6:11, 9:10–19.

[40] D.I. 24 ¶ 3.

[41] Hendrix, K. Dep. at 39:24–40:18.

further argues that such testimony was in response to hypotheticals posed by opposing counsel instead of a clear understanding of Midnight's vicious propensities.[42]

12. Although Kathryn has not resided at the Property since February 2020—before Midnight moved in and nearly three years before the incident—she testified that she visits the Property often.[43] Kathryn claims she never noticed or heard stories about Midnight acting viciously;[44] yet her daughter, Amanda, testified that Midnight barks at delivery persons.[45] Amanda also admitted that Midnight was involved in another incident where he jumped over their fence and attacked a neighbor's dog, which prompted animal control to conduct a second visit.[46] Amanda further stated that because another incident would require putting Midnight down, he now lives with a relative in New York.[47]

---

[42] D.I. 35 at 2.

[43] Hendrix, K. Dep. at 6:13–14, 7:3–9.

[44] *Id.* at 44:2–13 ("Q: Were you ever aware of any prior aggressive tendencies of that dog, Midnight, before this incident? A. No. Q. Did anybody ever tell you that he went after anybody or broke through the screen door or the storm door? A. No. Did you ever hear of him being aggressive, or barking at, or trying to attack mail carriers before this incident? A. No**.**") (emphasis removed).

[45] Hendrix, A. Dep. 28:17–24 ("Q. Did the dog bark when the mail person came to the door? A. Yes. When the mail person comes, when Amazon comes. Q. He tends to bark every time somebody comes to the door? A. Not usually, but usually with delivery services.") (emphasis removed).

[46] *Id.* at Dep. 21:3–11.

[47] *Id.* at Dep. 22:4–11. *But see* Hendrix, K. Dep. 17:13–18:17 (Kathryn testified that Amanda's family moved to New York and Midnight still lives with them).

13.     Another fact also moves the needle away from summary judgment—the need for a storm door.  The record evinces that one of Amanda's daughters may have left the storm door unlatched, unleashing Midnight on unlucky passersby and postal workers.[48]  But why was a secondary barrier installed in the first place?[49]  It is unclear exactly when Kathryn installed the additional barrier.  If the storm door was already part of the house before Kathryn moved out because she owned dogs previously, this decision would be easy.  On the other hand, if Kathryn installed the storm door *after* Midnight moved in, that may give a reasonable juror pause.  Thus, the date the storm door was installed is highly probative.

14.     Following the October 10, 2024 hearing, this Court instructed the parties to provide clarity on when the storm door was installed.  No updates have been provided to date.  Consequently, like a dog after a rainstorm, genuine issues as to the material facts in this case are still muddy.

## CONCLUSION

15.     This Court finds factual disputes exist and summary judgment is inappropriate.  The better course is to proceed to trial, where the factual predicate to determine whether Kathryn had actual knowledge of Midnight's vicious propensities

---

[48] Sanchez Dep. 36:6–10.

[49] *See* Hendrix, K. Dep. 29:12–30:12 ("It adds the additional barrier of another door between the mail carrier and any animals.")

can be explored and the credibility of all involved can be judged. Accordingly, the

Motion is **DENIED**.

**IT IS SO ORDERED.**

_____

The Honorable Kathleen M. Vavala

Original to Prothonotary.

cc.    Stephen A. Hampton, Esquire
        Kenneth M. Doss, Esquire

10